WARSOP *v.* COLE.

1. CONSPIRACY—CONFISCATION OF FURS BY STATE AND FEDERAL OFFICERS—EVIDENCE.

In action against State and Federal officers for unlawful conspiracy to deprive plaintiffs of furs without probable cause in violation of their rights, by prosecution of plaintiffs in both State and Federal courts and confiscation of furs under State and Federal laws, evidence consisting of direct proof of concert of action upon the part of the three defendants and circumstantial proof from which a natural inference may arise that their acts and conduct were in furtherance of a common design and purpose to deprive plaintiffs of their property *held,* to support finding of such conspiracy so as to render defendants liable for damages resulting from deterioration (31 Stat. at L. 188, 35 Stat. at L. 1137; 2 Comp. Laws 1929, § 6144 *et seq.*).

2. SAME—UNLAWFUL OVERT ACT BY ONE IS ACT OF ALL WHERE DONE IN FURTHERANCE OF ESTABLISHED COMMON DESIGN.

A conspiracy having once been established between the parties, whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all and all are liable irrespective of the fact they did not actively participate therein or the extent to which they benefited thereby as it is sufficient if the proof shows such a concert of action in the commission of the unlawful act or such other facts and circumstances from which the natural inference arises that the unlawful overt act was in furtherance of a common design, intention, and purpose of the alleged conspirators.

3. SAME—CONFISCATION OF FURS—ADVICE OF COUNSEL—REQUEST TO CHARGE.

In action of conspiracy against State and Federal officers who sought to confiscate furs under State and Federal statutes, request to charge upon right of defendants to rely upon the advice of counsel that had to do with the results of the con-

spiracy, not with its illegal creation, was properly refused as advice of counsel on an unrelated matter not essential to be averred or proven cannot constitute a defense to the act of the conspiracy (31 Stat. at L. 188, 35 Stat. at L. 1137; 2 Comp. Laws 1929, § 6144 *et seq.*).

Appeal from Branch; Jacobs (Theo T.), J. Submitted January 5, 1940. (Docket No. 93, Calendar No. 40,637.) Decided March 15, 1940.

Action by Harry Warsop, Robert A. Kerr, and Rollin A. Kerr, copartners doing business under the firm name of Kerr & Kerr, and Earl Stafford against C. G. Cole, James Tawse, and Stephen Creech for damages for conspiracy in the illegal seizure, detention and negligent care of furs. Bay City Freezer, Inc., added as party defendant. From verdict and judgment for plaintiffs against defendants Cole, Tawse, and Creech, they appeal. Affirmed.

*Kim Sigler* and *W. Glenn Cowell,* for plaintiffs.

*Thomas Read,* Attorney General, and *Edmund E. Shepherd,* Assistant Attorney General, for defendants Cole and Tawse.

*John C. Lehr,* United States Attorney, and *Peter P. Gilbert,* Assistant United States Attorney, for defendant Creech.

POTTER, J. Defendants Cole and Tawse, January 29, 1936, seized certain furs belonging to plaintiffs and sought to condemn them in the circuit court at Coldwater, Michigan. After a verdict by the circuit court in favor of plaintiffs, the furs were at once seized by defendant Creech. Proceedings were then commenced by Creech against Warsop in the United States district court at Detroit. After judgment for plaintiff in the Federal court, Warsop regained pos-

session of the furs. By reason of their deterioration, plaintiffs brought suit in the circuit court at Coldwater against Cole, Tawse and Creech charging unlawful conspiracy on the part of the three named defendants to deprive plaintiffs of the furs without probable cause in violation of plaintiffs' rights, defendants being State and Federal officers charged with acting together in unlawful combination and conspiracy to effectuate that purpose. From a verdict for plaintiffs, defendants appeal, raising two questions: *First,* Was the evidence sufficient to warrant a verdict against defendants Tawse and Cole in the conspiracy case; and, *second,* Was it a defense that an assistant attorney general advised defendants Cole and Tawse there was nothing he could do to prevent the seizure by the Federal officers of the furs in question?

This case had its origin in the action of Mr. Samuel Treat, a rival dealer in the community, who testified "I called Mr. Cole." He testified that at that time his father was secretary-treasurer of the Michigan fur dealers' association and had spent a lot of his own time and money in getting different laws passed by the State legislature. He said that "as long as we were paying a license to buy fur in the State of Michigan why should we let some peddler come in without a license and buy fur under our nose." Treat went to Union City with Gallor who subsequently purchased the furs and he testified that he helped mark the tags on the furs in question. A part of these tags was the basis of the action of the defendants in confiscating the furs in question. Mr. Denner, who was one of the conservation officers enlisted by Tawse in this matter, was a State district supervisor and also a Federal officer. He testified that it was Gallor he wanted to get; although Mr. Tawse testified that the furs ought never to have been taken at all by Creech. After the furs were

seized, they were taken to Battle Creek where they remained until February 4, 1936, when they were transferred to the office of the conservation department in Lansing. Plaintiffs at all times testified that defendants did not have a right to take the furs. Shortly after the seizure of the furs, a meeting was held at the office of Mr. Cowell, in Coldwater, called by plaintiffs' counsel, Mr. Sigler, at which various conservation officers as well as plaintiffs, Mr. Sigler, Mr. Cowell and others were present. At the time the parties were present in Mr. Cowell's office, Mr. Sigler represented to the defendants they had no authority to take the furs or to commence condemnation proceedings. At that time, defendants claimed the right to proceed under the State law (see 2 Comp. Laws 1929, § 6144 *et seq.* (Stat. Ann. § 13.1221 *et seq.*). They claimed that if they could not take the furs under the State law, they would institute proceedings in the Federal court under the Lacey act (see 31 Stat. at L. 188, 35 Stat. at L. 1137 [18 USCA, §§ 392, 393]). At the time these proceedings were originally instituted, suit was commenced against Warsop in the State court but this was subsequently dropped, or was not brought to judgment, and the State proceeded to attempt to condemn the furs in question. At the time the conference was held in Mr. Cowell's office in Coldwater, such conference was called in order to find a suitable and satisfactory way of disposing of the furs and paying the money into court to abide the result of the condemnation proceedings because the furs in question were subject to deterioration. Nothing came of this conference. The parties refused to stipulate for the sale of the furs. Before the case was tried in the circuit court at Coldwater, Cole talked with Warsop by telephone and suggested to him that he should plead guilty in that court.

There is some dispute about whether this claim of the right to proceed in the Federal court if a judgment of confiscation was not obtained in the State court was made upon the part of all the officers. In any event, complaint was made against Warsop for violation of the Lacey act and prosecuted in the Federal court.

While this suit for condemnation of the furs in the State court was pending, Creech evidently became satisfied that if the suit were planted in the Federal court there could be no doubt about its result. Creech told Warsop that if Cole did not want the case, he was going to take it into his own hands. He said the State got a raw deal and he would follow it up, that he was taking the matter up for the State on Mr. Cole's part. Creech testified that "immediately after the court (circuit court) made his determination, or finding in that particular case, when everybody went out of the court room here, I told Cole that I was going to seize these furs," and that Cole told him to see Rector, who was with Washburne.

The fact is, that at the time the furs were released by the circuit court and directed to be turned over to plaintiffs and notwithstanding the fact the furs were actually in the office of the department of conservation at Lansing, Creech immediately sought out Mr. Rector, the representative of the conservation department present at the trial of the case at Coldwater, told him that he had to go to Grand Rapids and that it would save the cost and expense of coming to Lansing if Rector would then deliver the furs to him. Creech had already resolved upon the prosecution of this case in the Federal court. At that time, Creech handed Rector six confiscation tags "and asked me to, or demanded me to place them on the furs when I returned to Lansing," so that the

defendant Creech actually took possession of the furs prior to the time there was any talk in the department of conservation between Mr. Tawse and others about surrendering the furs to Creech.

The furs were in prime condition when taken by Creech.

After the furs had been seized by Creech in pursuance of the arrangement made with Rector, he stated, as testified by several witnesses who heard him, that he was not going to abide by the decision of a one-horse court but was going to obtain justice in the Federal court. March 5, 1936, Creech took the furs to Bay City and stored them with the Bay City Freezer Company and thereafter caused a complaint to be made against Warsop for a violation of the Lacey act.

After the furs had been directed by the circuit court to be turned over to plaintiffs by the department of conservation, Warsop went to Lansing in order to obtain the furs but was told the State had washed its hands of it.

After the time Creech had taken possession of the rat skins and taken them to Bay City, he went to Warsop and sought to get him to plead guilty and pay a fine and told him that he was going to lose his furs anyway. At the time Creech signed the confiscation tags, which he turned over to the Federal court, he signed those in the name of Rector and Cole. Cole likewise went to Athens with Creech some time after he had seized the furs but before a warrant had been issued in the Federal court for Warsop. He testified he only accompanied Creech. Tawse, Cole and Creech were all present in the Federal court, in Detroit, when the proceedings were brought to condemn the furs under the Lacey act. After a hearing, the Federal court in effect approved the holding of Judge Jacobs in the circuit court and

plaintiff Warsop was discharged from liability. Warsop, after having obtained an order in the Federal court for the surrender of the furs, went to Bay City to procure them and ultimately the furs were turned over to plaintiffs. Warsop testified the furs had been chewed by rats and mice, were mouldy, wet and soggy, that every skin was chewed to some extent, some then in such condition as to be called trash, no good, and of no value, a large portion of them were chewed around the edges and through the center and some of them chewed all over, some were a quarter eaten up, some were half eaten up, and the entire lot was damaged to the extent of approximately 50 per cent. of the value thereof.

It is claimed defendant Tawse is liable because he was the regional supervisor to whom Cole had to report, that he advised the confiscation of the furs in question, and that he was the man who suggested that the furs could be confiscated under the Lacey act in the Federal court if they were not successful in the circuit court; that Cole was the man on the ground who looked after the shipment of the furs although Tawse directed what was to be done; that Creech came to Coldwater in pursuance of an arrangement with Cole who acted under orders from Tawse.

There is some claim made that at the time the circuit court ordered the furs to be turned over to plaintiffs no order had yet been actually entered, and that until such order was entered nothing could be done towards taking the furs by the Federal authorities. This seems to be entirely immaterial because on the very day the furs were ordered returned to plaintiffs, Creech gave Rector the seizure tags indicating the seizure of the furs had been made, signing the names of Cole and Rector on the tags as witnesses, and Creech testified that at that time he actually seized the furs.

There can be no question but that Tawse, in the presence of Cole, threatened to take action in the Federal court to hold the furs if they were unsuccessful in the State court, and that Creech was present in pursuance of some arrangement made between him and Tawse to seize these furs immediately after, if not before, the circuit court surrendered its authority over them.

It is claimed the furs were seized in order that they might be presented as evidence to the Federal court. But the furs were not presented as evidence either in the circuit court at Coldwater or in the Federal court, but were held by Creech in the Bay City Freezer Company, at Bay City.

The fact that both Tawse and Cole, and there is testimony sufficient to support this fact, at the time this arrest was made in pursuance of Treat's entreaties for the purpose of procuring the arrest of Gallor and when the parties were present in Cowell's office at the conference called by Sigler, said they were going to prosecute this case in the State court or in the Federal court; that prosecution was instituted in the State court which resulted in a verdict against defendants; that Creech, after saying to Cole he was going to seize the furs in question, seized them, furnishing Rector with the confiscation tags while Rector was yet in Coldwater, carrying the furs to the Bay City Freezer Company and subsequently, with Cole, visiting Warsop, and later instituting proceedings against Warsop; that all the defendants were present in the Federal court when the only case the parties knew of commenced in both the State and Federal courts was the one at bar, is sufficient to show a conspiracy on the part of defendants to deprive plaintiffs of their property. There is direct proof of concert of action upon the part of the three defendants and there is likewise circumstantial proof from which a natural inference may arise that their

acts and conduct were in furtherance of a common design and purpose to deprive plaintiffs of their property. There is no question but that the conspiracy between the parties having been once established, whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein or the extent to which they benefited thereby. It is sufficient if the proof shows such a concert of action in the commission of the unlawful act or such other facts and circumstances from which the natural inference arises that the unlawful overt act was in furtherance of a common design, intention and purpose of the alleged conspirators to commit the same. *Farmer* v. *United States,* 223 Fed. 903.

In *People* v. *Richards,* 1 Mich. 216, 223 (51 Am. Dec. 75), it was said:

"In every case that can be adduced of a conspiracy, the offense depends upon the unlawful agreement, and not on the act which follows it; the latter is but the evidence of the former. * * * In 3 Chitty's Criminal Law (5th Am. Ed.), p. 1141, it is said, that to render the offense complete, there is no occasion that any act should be done in pursuance of the unlawful agreement entered into between the parties; still less can it be necessary to show that any party was actually defrauded; for the conspiracy is the essence of the charge, and, if that be proved, the defendant will be convicted."

In *Alderman* v. *People,* 4 Mich. 414 (69 Am. Dec. 321), it was said:

"The gist of the offense in conspiracy is the unlawful combination and agreement. It is not necessary, to constitute the offense, that any overt acts should be done in pursuance of such combination

and agreement, nor that such overt acts should be alleged.

"The combination and agreement, the intent to commit the illegal act, constitutes the offense, and in this respect it diverges from the general rule of criminal law."

In *People* v. *Clark,* 10 Mich. 310, defendant was charged with conspiracy. The court said:

"The agreement set up in the information in this case embraces all the elements of the statutory crime, and is, therefore, an agreement to commit the crime of obtaining money under false pretenses. This being the design, and this design itself being criminal if agreed upon by conspirators, whether carried into effect or not, there are no authorities which require any further allegations. * * *

"This was not an indictment for the fraud, but for the *conspiracy* to defraud. If the conspiracy were proved, the case would be made."

In *People* v. *Saunders,* 25 Mich. 119, it was said:

"It is wholly immaterial whether, in the absence of any conspiracy, the purchase would have been innocent in the purchasers or not, or whether, considered by itself, there was any illegality in the attempt at a compromise. It is the unlawful conspiracy that constitutes the crime, and not acts done in pursuance of it."

In *People* v. *Arnold,* 46 Mich. 268, it was said:

"It is conceded that if the act which the conspirators combine to perform is unlawful, it is not necessary to set out in the information the means intended to be employed in accomplishing it. * * *

"If it were essential in these cases to allege and prove an overt act, the question would be of easy solution; but, as already stated, this is not needful, for the crime charged is the conspiracy, and that

requires no overt act whatever to render it complete. * * * The proof of an overt act may be important for the bearing it may have upon the evidences of conspiracy, and also as it may aid the court in justly graduating the punishment in case of conviction. Alleging and proving it, therefore, is much like alleging and proving matter of aggravation in other cases."

The request to charge upon the right of defendants to rely upon the advice of counsel had to do with the results of the conspiracy, not with its formation. It related to the consummation thereof and not to its illegal creation. It had to do with overt acts committed by the conspirators but not with its origin. It was not necessary that such overt acts in pursuance of the conspiracy be alleged or proven. When such acts are not necessary to be alleged and proven, it is difficult to see upon what basis the advice of counsel as to what is unnecessary to be alleged and proven may be permitted to stand. The advice of counsel on an unrelated matter not essential to be averred or proven cannot constitute a defense to the act of the conspiracy.

Judgment affirmed, with costs.

BUSHNELL, C. J., and SHARPE, CHANDLER, NORTH, and McALLISTER, JJ., concurred with POTTER, J. WIEST and BUTZEL, JJ., concurred in the result.