STILLINGER & NAPIER, A PARTNERSHIP, APPELLEE, V. CENTRAL
STATES GRAIN COMPANY, INC., A CORPORATION, APPELLANT.
82 N. W. 2d 637

Filed April 26, 1957. No. 34084.

*Neighbors & Danielson, James L. Macken,* and *Beatty, Clarke, Murphy & Morgan,* for appellant.

*Charles M. Bosley* and *Robert C. Bosley,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The action of appellee was for the recovery of a judgment of $21,750 and interest against appellant; an adjudication that it was a lien upon its grain storage facilities at Imperial, Nebraska; and for a foreclosure of the lien. The lien claimed included work and material furnished in the construction of grain facilities at Atwood, Kansas.

It was stated in the cause of action of appellee that it, as a subcontractor, on November 16, 1951, made a contract with Western Construction Company, trade name of Jack E. Mack, because of which appellee performed construction work on the Imperial and Atwood facilities; that payments for the period to April 1, 1952, were made; that appellee had not been paid for work done and materials furnished from April 1, 1952, to April 21, 1952; and that the amount owing therefor was the sum of $21,750.

The pleading of appellant upon which the case was tried was the second amended answer and cross-petition. It answered the petition of appellee by an admission of the contract of November 16, 1951, called the subcontract,

between it and Jack E. Mack; by a denial of all other matters set forth therein; and by allegations that the lien claimed by appellee was false and fraudulent, that the claim of lien was filed with dishonest design for the purpose of defrauding appellant and casting a cloud on the title to its property, that the claim of lien included items not furnished to the Imperial construction, and that it failed to give appellant credit for payments made to or received by appellee.

The cross-petition asserted four causes of action:

The first was based on payments made by appellant to suppliers of materials to appellee incident to the construction contemplated by the subcontractor. The suppliers filed liens against the Imperial and Atwood grain facilities and appellant was compelled to pay and discharge them in the sum of $14,303.46 for which it sought judgment against appellee.

The second asserted that appellee contractually warranted its work and material; that it knowingly, in violation of its obligation, installed defective concrete and failed to tighten bolts and braces; and that the damage to appellant because of the former was $15,000 and the damage resulting to appellant because of the latter was $5,000, for the total of which it prayed judgment.

The third claimed that appellee and Jack E. Mack conspired to defraud appellant and as a consequence thereof it was damaged by misapplication by Jack E. Mack in the sum of $22,854.90 which appellant seeks to recover.

The fourth alleged that by overpayment made by appellant to appellee, accomplished by conspiracy and fraud of Jack E. Mack and appellee, it suffered damage in the sum of $16,962.50 for which judgment was asked against appellee.

The cause of action of appellee and the first cause of action of appellant were disposed of by stipulation of the parties and judgments in accordance with the stipulation. They are not involved in this appeal. The district court, after trial of the issues concerning the second,

third, and fourth causes of action, found generally for appellee and against appellant and that the proof failed to establish fraud or conspiracy by or between Jack E. Mack and appellee in any respect as charged by appellant or a proper measure of damages for any of the acts or wrongs alleged to have been committed by appellee. The trial court rendered a judgment dismissing the second, third, and fourth causes of action and denied the motion of appellant for a new trial. The appeal is from the denial of the motion for a new trial.

The numerous persons who participated in the circumstances of this litigation and who were witnesses for appellant may appropriately be identified as a contribution to economy of space and prevention of the necessity of repetition of their given names:

John Ellis, an investment broker associated with Eastman, Dillon & Co., a member of the New York Stock Exchange, and Robert Brady, an employee of that firm, met Jack E. Mack, hereafter referred to as Mack, the former in February and the latter in February or March of 1951. They assisted Mack in procuring financing for the grain storage venture and they presented the proposal of Mack for the venture to Henry Sears & Co. and Payson & Trask.

Henry Sears, a partner, and Stellan C. Wollmar, an associate, of Henry Sears & Co., a private investment company of New York City, each participated in the preliminary negotiations with Mack.

Charles E. Saltzman, a partner of Henry Sears & Co., was a director of appellant when the agreement with Mack was executed.

Frederick K. Trask, Jr., was a partner in Payson & Trask, New York City, a firm employing its own capital in the equity financing field. He participated in the preliminary negotiations with Mack.

James E. McMullen, a partner in Payson & Trask and secretary-treasurer of appellant, had part in the preliminary negotiations with Mack and represented his

firm, Henry Sears & Co., and appellant in their dealings with Mack after the agreement was made. He is a public accountant and has held important assignments with large industrial concerns.

Robert Hellendale and Edgar C. Morrison are each associated with the law firm of Carter, Ledyard & Milburn of New York City and they each participated in the preliminary negotiations, and the drafting of the agreement of appellant with Mack and the stock option agreement.

John D'Antonio, a graduate and practicing engineer, was employed by appellant as its technical representative during the construction of the Imperial and Atwood facilities to perform the duties of engineer specified in the agreement with Mack.

Arven D. Reynolds was employed by Mack from September 1949 to February 1952 as office manager.

Jack E. Mack was president and director of appellant, the contractor for the construction of the facilities, and he was sole owner of Western Construction Co.

The individuals named in the foregoing identification will each henceforth be referred to herein by his surname.

Robert Stillinger was a partner of appellee. He will be identified herein by his surname.

Mack was engaged in the construction of grain storage facilities. The Commodity Credit Corporation needed storage capacity of which there was a shortage and in order to interest persons in construction thereof offered to guarantee rentals therefor during a designated period of time. Mack had occupancy agreements for ten sites in Kansas and Nebraska and desired to build facilities thereon for himself but he had to secure large financial assistance to realize his desires in this respect. He went to New York City in the early part of 1951 seeking financial aid. He talked to Ellis and his associate Brady concerning his proposals and desires. They were engaged to assist Mack in procuring the financing he desired and for their services, if successful, they were to

have 5 percent of the equity stock in the company which would be organized.

The proof is that the words "equity stock" generally refer to the common stock of a corporation which is completely at the risk of the business and which obtains its reward only through the earnings of the business the corporation conducts; and that the term "senior financing" refers to forms of financing senior to the common stock and includes both preferred stock and loans made to the company. Ellis and Brady told Mack that equity investors would exact between 40 and 60 percent of the equity stock and probably some evidence of seniority for the money they contributed. Mack proposed to erect the facilities at cost without money profit but would get his compensation in the form of common stock. He would thus avoid high taxes on ordinary income and attain a position to realize a long-term capital gain.

Ellis prepared a memorandum designated "A Grain Storage Proposal." It stated Mack would take his profit in the form of common stock in the new corporation. It was examined and approved by Mack and was sent to several venture capital groups including Henry Sears & Co. and Payson & Trask. There were negotiations with the two firms last named beginning in May 1951. They were interested in contributing equity money but a firm commitment of senior financing had not been secured. The Equitable Life Assurance Society of New York City seemed to be a probable contributor of senior money. It was explained to it that the advantage of the proposal of Mack resulted from the fact that he was to do the construction work at cost and that the facilities would be completed at a very low competitive cost. A conference was held on June 6, 1951, attended by representatives of The Equitable Life Assurance Society, Henry Sears & Co., Payson & Trask, Ellis, Brady, Mack, and his counsel. The Equitable Life Assurance Society had approved a 2-million-dollar mortgage loan but there

was an unsolved problem. The Federal Reserve Board had in March 1951 adopted a regulation which limited the amount of a mortgage loan to 50 percent of the cost of the security. It was not known whether the Federal Reserve Board would construe the cost of security in this instance as the cost for which Mack offered to build the storage or the cost as it would be if normal profit in cash was taken by the contractor. It did not develop that this could be ascertained in advance. The Equitable Life Assurance Society shortly thereafter withdrew and the ten-site storage proposal was not realized.

The preliminary negotiations incident to the execution of an integrated agreement of uncertain meaning are admissible for the purpose of ascertaining the intentions of the parties, the conditions present when the writing was made, and the purposes intended to be accomplished. The contract between appellant and Mack does not expressly state that he was to build the facilities at cost but it consists of two writings, a construction contract and a stock option agreement, which must be interpreted together. The preliminary negotiations establish beyond doubt that the agreement was that Mack was to build the storage structures at cost and that appellant in consideration therefor was to issue to Mack up to 40 percent of its equity stock at a nominal cost without obligation on his part to contribute to senior money. This court has recognized and applied the doctrine of admissibility of preliminary negotiations subject to the limitation that plain terms of the writing resulting therefrom may not be varied. There is no variation of plain terms involved in this case. Nebraska Hardware Co. v. Humphrey Hardware Co., 81 Neb. 693, 116 N. W. 659; Wilderman v. Watters, 149 Neb. 102, 30 N. W. 2d 301; Sofio v. Glissmann, 156 Neb. 610, 57 N. W. 2d 176; Restatement, Contracts, § 242, p. 341.

A short time before August 24, 1951, Mack informed Ellis and Brady that he had a more limited proposal to make. The sole difference between his first proposal

and his second one was size. A construction-at-cost plan was inherent in and common to both. Substituted for ten facilities with a storage capacity of about 7 million bushels in the first were two in the second with about 2 million bushels of storage capacity. The second proposal contemplated a cost of about $400,000. Mack was asked to put the proposal in writing. Ellis and Brady interviewed Wollmar who said he was interested in exploring the new development. Mack went to New York later and had with him documentation to support his cost estimates. He had a telegraphic bid of appellee as a proposed subcontractor of much of the work which was used by Mack to obtain the execution of the prime contract. The circumstances point quite clearly to the participation of appellee very early in the fraudulent acts and pattern established by evidence of later additional facts.

The agreement between appellant and Mack was made and executed November 9, 1951. It consists of two instruments, the prime construction contract and a stock option agreement. These must be considered and interpreted as one. They were made at the same time, concerned the same subject matter and undertaking, and one was signed as a condition of the signing of the other. Nebraska Hardware Co. v. Humphrey Hardware Co., *supra;* Campbell v. Ohio National Life Ins. Co., 161 Neb. 653, 74 N. W. 2d 546. Appellant was organized to accomplish the business purposes of the parties. Mack was elected a director and president of the newly formed corporation. From the inception of the life of appellant he occupied a fiduciary relationship to it and he must be treated as a trustee. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393; Beaumont v. Folsom, 136 Neb. 235, 285 N. W. 547; Duffy v. Omaha Merchants Express & Transfer Co., 127 Neb. 273, 255 N. W. 1; Pepper v. Litton, 308 U. S. 295, 60 S. Ct. 238, 84 L. Ed. 281. Mack, as a fiduciary, was prohibited from business relationships with the corporation of which he was a director and

chief officer without complete and truthful disclosure. Any nondisclosure by him was, in the circumstances of this case, a material misrepresentation and fraud. Rettinger v. Pierpont, *supra.* He was, as a fiduciary, obligated to conduct himself by the strict standards of rectitude that bind a trustee. Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1. The representations of Mack that he would construct the storage structures at cost, that his obligations to appellee were a definite amount, and his subsequent clandestine profits and dealings with appellee constituted fraud as a matter of law. Keystone Surgical Supply Mfg. Co. v. Bate, 187 Pa. 460, 41 A. 299.

Appellant opened an account with The First State Bank of Scottsbluff December 7, 1951, and deposited $109,956. The deposit was to be used by Mack to pay obligations incurred by him in the construction of the grain storage facilities and this and other amounts that were later deposited in the account of appellant were placed therein upon the representation that Mack had incurred obligations on that account. Mack testified that to obtain additional funds he would certify to D'Antonio the expenditures he had incurred and based thereon D'Antonio would make a certificate, present it to the appellant, and it would then make funds available for the use of Mack by placing deposits in its bank account. Mack had authority to withdraw funds to pay the cost of construction of the facilities. On December 7, 1951, Mack had 2 cents in his bank account which appeared in the records of the bank as Western Construction Company, trade name for Mack. On that date he transferred $50,000 from the bank account of appellant to his own bank account. His account was on that date debited with the sum of $26,682.49. This entire amount, except the opening balance of 2 cents and a payment of $500 to Fairbanks Morse, was converted and misapplied by Mack. The payment of two personal loans in the sum of $25,000 was included in the amount debited to

his account that date. The result was that Mack misapplied $26,182.49 the day the account of appellant was opened.

The account of Mack was debited with a $28,462.50 payment to appellee December 12, 1951. Mack transferred another $50,000 December 10, 1951, to his account from the account of appellant. The deposits in the account of Mack from sources other than appellant were $1,164. It is certain that the $28,462.50 payment to appellee came from the funds of appellant and not from funds of Mack. Appellee has not accounted for the payment to it of the $28,462.50.

Mack sent D'Antonio a letter, dated February 5, 1952, to which were attached statements of his accounts with appellee and various suppliers. He stated therein that these accounts were "accurately established from records." He represented thereby that he had paid appellee, the subcontractor, on December 4, 1952 (1951), $34,426.25 and on January 15, 1952, $17,891.15, a total of $52,317.40. Mack, when he was asked the purpose of sending this letter to D'Antonio, stated it was to receive funds. The construction contract made it the duty of Mack to furnish D'Antonio all vouchers, invoices, and receipts required by him to perform his duties as engineer for appellant. The contract made it the duty of D'Antonio to determine the amounts expended or obligations incurred by Mack and to certify to appellant the findings he made in the exercise of his duties. Mack was bound to furnish complete and truthful information to D'Antonio and he was strictly obligated to make certificates based thereon. Each of them knew the obligation of the other because the contract clearly expressed it and conversations with Mack had discussed it. Mack knew that the account of appellee enclosed with the letter of February 5, 1952, was false. The letter was dictated by Mack and written by Reynolds, the office manager of Mack. He testified he knew the representation made by the letter concerning the account of ap-

pellee was false and that the amount paid appellee to that time was only about $28,000; and that Mack told Reynolds at the time the letter was written that the purpose of inflating the accounts was to enable Western Construction Company to make a profit on the Central States construction job. Mack had previously told Reynolds that he was putting up the facilities at cost for the figure he had submitted in New York.

D'Antonio would not make and execute a certificate on the statement of Mack of his payments to appellee. He refused to do so until written evidence from appellee was secured and submitted. Mack was advised after receipt of his letter of February 5, 1952, that it did not satisfy the requirements of the contract and no further advances could be made by appellant until a receipt from appellee was furnished. On the date of the letter Mack had paid appellee $29,462.50. The letter represented that he had paid appellee $52,317.40 as of that time. Concealment of a discrepancy of $22,854.90 was a pressing problem. The plan adopted by Mack was to knowingly and fraudulently misrepresent the facts. Reynolds testified that he heard Mack request suppliers and subcontractors to furnish him receipts showing they had been paid more money than they had actually received. Appellee was one to whom the request was made. It complied and furnished Mack with a confirmatory statement addressed to appellant in which payment of $52,317.40 is shown to have been made by Mack to appellee. The significance and importance of this writing justifies setting it out, with omission of the letterhead:

"Central States Grain Co.             12 Feb., 1952
Scottsbluff, Neb.

           Att'n Mr J. H. Mack, President
Gentlemen:

Anent our contract for construction of grain storage units at Atwood and Imperial, our records show the following current position:

Total Contract                         $137,705.00

| | | |
|---|---|---|
| 1st Payment | $34,426.25 | \ |
| 2nd " | 17,891.15 | 52,317.40 |

Balance Due                                   $ 85,387.60

Yours truly
STILLINGER-NAPIER
T. D. Napier"

Mack wrote a letter to D'Antonio dated February 13, 1952, in which he said he had talked with Tom Napier that morning by telephone and he was sending his statement which would be forwarded as soon as it was received by Mack. He said: "I think that this will once and for all clarify the issue of money disbursements. * * * Without a doubt Jim (McMullen) was absolutely right in his insistence for this documented data * * *."

When Mack had paid appellee but $29,462.50 but represented he had paid $52,317.40 and thereafter secured from appellee a written formal statement directed to appellant that Mack had paid appellee the larger amount, consisting of two items, it should be considered as established that appellee and Mack acted in fraudulent concert to defraud appellant. It may not be considered a mere coincidence that such a fraudulent figure could have been severally adopted. Such a situation convincingly speaks of a willful design and a mutual understanding of conspirators.

A conspiracy is defined in Rettinger v. Pierpont, *supra,* in this manner: "A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means. * * * The principal element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury."

In Trebelhorn v. Bartlett, 154 Neb. 113, 47 N. W. 2d 374, the court said: "A conspiracy, like other facts,

may be proved by direct or circumstantial evidence, and one means of proof is by showing overt acts or representations of the individuals charged with conspiracy. From the fact that different persons at different times by their acts or representations pursued the same object, the jury may, in connection with other facts, infer the existence of a conspiracy to effect that object. * * * In an action for damages based upon a conspiracy to defraud by wrongful acts or false representations, the damages and not the unlawful confederation is the gist of the action, so that if damages are shown to have resulted to plaintiff from such acts or representations of defendants or any of them, then a judgment against such defendants may be sustained without establishing a conspiracy among them all."

The court said in Marsh-Burke Co. v. Yost, 98 Neb. 523, 153 N. W. 573: "A conspiracy need not be established by direct evidence of the acts charged, but may, and generally must be, proved by a number of indefinite acts, conditions and circumstances, which vary according to the purpose to be accomplished. If it be proved that defendants, by their acts, pursued the same object, although by different means, one performing one part and another another part, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object."

Mack, by his manner of testifying, confirmed the conclusion that he had acted deceitfully. When he was asked if he had paid appellee before February 5, 1952, the sum of $52,317.40, he answered: "That I don't know either." He was then asked if that sum was accurately established from his records as disbursements to Stillinger & Napier. His answer was not a model of forthrightness or clarity. Here it is: "I don't know out of that designated payment right there what our profit motive was at that time."

The subcontract with appellee required a total pay-

ment for the construction provided by its terms of $137,705. While Mack was testifying concerning the claimed payment of $52,317.40 to appellee he said he certainly had a profit motive. He was asked to tell how he would accomplish the making of a profit on the subcontract with appellee and he said one way of doing it would be for him to pay appellee less than the total contract price for the work appellee was to accomplish and another way of doing it would be "by refund." He was then pressed for an explanation of how he was going to make a profit out of that subcontract and he then stated: "Well, in the form of refund, which would be the logical way to handle the contract." It seems certain that Mack was determined to get money from appellant by some dishonest method and appellee showed effective willingness to cooperate with him to that end. Mack finally testified that the claim made by him that he had paid appelleee in two payments a total of $52,317.40 before his letter of February 5, 1952, was false. Stillinger also denied payment to appellee of this amount. However, because of the signed statement of appellee of February 12, 1952, which was procured and furnished by Mack to D'Antonio, he executed a certificate relying thereon and Mack was given credit for $52,317.40. Thereby Mack, by the cooperation and misrepresentation of appellee, misapplied and converted the difference between that amount and $29,462.50 which Mack had in fact paid appellee, or the sum of $22,854.90, and appellant sustained damage in that amount. That is the amount of the third cause of action. The recovery appellant seeks in that regard is for the conversion of its own funds by an unfaithful fiduciary who was bound to conduct himself in regard to appellant in the most impeccable manner. He was assisted by appellee and they both participated and cooperated to produce that result. A conspirator is liable for the consequences of a conspiracy without regard to whether or not he is rewarded by benefit from it.

The doctrine is well stated in Warsop v. Cole, 292 Mich. 628, 291 N. W. 33: "There is no question but that the conspiracy between the parties having been once established, whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein or the extent to which they benefited thereby. It is sufficient if the proof shows such a concert of action in the commission of the unlawful act or such other facts and circumstances from which the natural inference arises that the unlawful overt act was in furtherance of a common design, intention and purpose of the alleged conspirators to commit the same." See, also, Hutson v. Imperial Royalties Co., 135 Kan. 718, 13 P. 2d 298; Anderson v. Thacher, 76 Cal. App. 2d 50, 172 P. 2d 533. The conclusion is that appellee is liable to appellant for $22,854.90 which Mack misapplied. However, as is developed by later discussion of the case, it was the intention of Mack and appellee to participate jointly and dishonestly in $52,317.40 of the funds of appellant.

Mack was required by the construction contract to furnish D'Antonio with vouchers, invoices, and receipts showing the expenditures and incurred obligations and the engineer was required by that instrument to certify his findings to appellant. It was implicit in these provisions that truthful evidences of expenditures and incurred obligations were contemplated and required.

Appellee, after it commenced construction work as the construction contract intended, submitted progress estimates to Mack for the purpose of obtaining payment for work done by appellee. In his letter of February 5, 1952, Mack referred to the fact that he then had before him a copy of progress estimate No. 1 for concrete and that the amount of it was $11,000. It was dated February 2, 1952. This figure represented all the work which appellee had done on the storage facilities at Imperial and Atwood. No credit was given

for the actual down payment made by Mack to appellee of $29,462.50 or for the purported payment of $52,317.40. The progress estimate No. 1 was paid by Mack in two payments of $5,000 on February 9, 1952, and $6,000 on February 16, 1952. D'Antonio certified these expenditures February 25, 1952.

Thereafter on February 18, 1952, progress estimates Nos. 2 and 3 were submitted in the amount of $10,000 and $5,000, respectively, and they were paid by Mack on March 1 and March 14, 1952.

The progress report No. 4, dated March 3, 1952, detailed the work done at a cost of $34,250, recited the payments made in the amount of the progress estimates Nos. 1, 2, and 3 in the total sum of $26,000, and showed a balance due of $8,250. Mack paid this to appellee.

The progress estimate No. 5, dated March 17, 1952, detailed the payments made on the four previous estimates and claimed a balance due of $5,300 which was paid to appellee by check of appellant signed by McMullen, the treasurer of the corporation.

The progress estimate No. 6, dated April 1, 1952, detailed all work done on the storage facilities at Atwood and Imperial and stated the value thereof as $51,325. It listed each of the five payments made in the respective amounts of the five previous progress estimates constituting total payments of $39,550 and stated a balance of $11,775. This was paid to appellee April 18, 1952, by check of appellant signed by McMullen. The check was endorsed by appellee and it was paid. There was on the back of the check above the signature of appellee the following: "Payee acknowledges full payment of all indebtedness for services, labor and supplies to April 1, 1952, performed or furnished for grain storage facilities at Imperial, Nebraska, and Atwood, Kansas."

Appellee gave what is called estimate No. 7, bearing date of April 18, 1952, to D'Antonio on the morning of April 19, 1952. It included all work done to the latter

date. It set forth in detail the work done by appellee and the cost thereof as $63,825. The deductions therefrom were stated as "Less estimates 1 through 6" $51,325 and it claimed as unpaid for work done from April 1, 1952, through April 18, 1952, $12,500. However, it was stipulated at the trial that the value of the work done by appellee on construction of the storage facilities from April 1, 1952, through April 18, 1952, was the sum of $14,825 and judgment therefor was rendered in this cause in favor of appellee.

The value of the work done by appellee to April 1, 1952, as shown by progress estimate No. 7 prepared by appellee and by other evidence, was $51,325 and appellee was fully compensated therefor by payment to it of the amounts claimed to be due by the first six progress estimates. There should be added thereto the value of the work done after April 1, 1952, which was, as stipulated and adjudicated, the sum of $14,825. Hence the total value of the work done by appellee by virtue of its subcontract was the sum of $66,150. Appellee received $29,462.50 and $51,325, or a total of $80,787.50. Appellee was overpaid in this respect $14,637.50. This is the subject matter of the fourth cause of action.

There is no material dispute in the proof. The facts are convincing that Mack and appellee conspired together to defraud appellant of $52,317.40. It seems beyond doubt that they acted in concert to this end for the gain of each. Mack had the benefit of $22,854.90 by virtue of the admittedly dishonest statement of February 12, 1952, made by appellee. That was an overt act of appellee in accordance with the design of the parties to the conspiracy. Mack showed his appreciation by refraining from requiring appellee to account for the down payment and it intended thereby to obtain an overpayment of $29,462.50. The fact that appellee did not intend to give terminal credit for the down payment is established beyond the area of argument or dispute. If this was not true, why did appellee file a lien against

the storage facilities when the amount it was secreting exceeded the amount of the asserted lien.

There is no conflict in the evidence that appellee installed defective concrete in the storage facilities of such character and under such conditions that it was unsuitable for the purpose intended and required; that it was necessary to remove and replace it with proper and suitable concrete; and that the fair and reasonable cost thereof was the sum of $4,009.81 which appellant paid and because thereof it was damaged in that amount. There were many bolts used in the construction of the facilities for fastening braces, putting on aluminum siding, and for other purposes. Appellee inserted the bolts but did not tighten the burrs on them. They were required to be made what is spoken of in the record as "wrench tight." This required going over the entire structures. It was a very considerable undertaking. There were twelve to fifteen men employed to accomplish the necessary result. The fair and reasonable cost was $4,205.46 which was paid by appellant and it was thereby damaged in that amount.

If a construction contract is substantially performed, as was the situation in this case, the damage which the owner suffers because of defective workmanship is measured by the fair and reasonable cost of remedying the defects. Cartwright & Wilson Construction Co. v. Smith, 155 Neb. 431, 52 N. W. 2d 274.

Appellant should have judgment against appellee as follows: On the second cause of action for the sum of $8,215.27 with interest thereon at 6 percent per annum from the date it is rendered; on the third cause of action for the sum of $22,854.90 with interest thereon at 6 percent per annum from February 12, 1952; and on the fourth cause of action for the sum of $14,637.50 with interest thereon at 6 percent per annum from the date the judgment is rendered.

The judgment of the district court as to the second, third, and fourth causes of action of appellant should be

and it is reversed and the cause is remanded with directions to the district court for Chase County to render a judgment herein in favor of appellant and against appellee in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.