REID HALBERT, APPELLEE, v. FOOD HOST U.S.A., INC., A CORPORATION, APPELLANT.

202 N. W. 2d 735

Filed December 8, 1972. No. 38472.

Luebs, Tracy, Huebner & Dowding and D. Steven Leininger, for appellant.

Perry, Perry & Witthoff, Robert E. McKelvie, and Davis, Bailey, Polsky & Huff, for appellee.

Heard before WHITE, C. J., SPENCER, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

WHITE, C. J.

In this jury-waived case the district court entered a judgment in favor of the plaintiff in a suit on an exchange contract for stock in the defendant corporation. Plaintiff asserted he was entitled to registered shares in the defendant corporation and the defendant guaranteed him that such registered shares would be worth at least

$15 per share. The district court, on the facts, found in favor of the plaintiff and required the defendant to replace the unregistered shares with registered shares, and to purchase the latter from the plaintiff at the guaranteed price of $15 per share. We affirm the judgment of the district court with a modification as to the amount of interest allowable.

The background facts are that plaintiff Halbert owned all of the corporate stock of Kings Food Host of Hastings, Inc., and Kings Food Host of Grand Island, Inc., hereinafter referred to as "the companies." Each of these companies owned by Halbert operated a restaurant business in its respective city. In the month of August 1968, plaintiff entered into negotiations with L. C. Price, president of the defendant Food Host U.S.A., Inc. Because of tax advantages it was decided that plaintiff's shares in the companies would be exchanged for Food Host shares. The evidence shows that at that time Food Host had plans to make a public offering of its stock in the near future; and that Price was willing to guarantee that the shares would come out to the public at a cost of not less than $37.50 per share. On September 30, 1968, plaintiff and an officer of Food Host signed a stock exchange contract. In pertinent part, the contract provided:

"(b) On date of closing, Food Host will transfer that number of shares of Food Host stock which, when multiplied by $37.50 per share and added to the $15,000.00 debenture bond which will also be issued at the same time, will equal $139,987.50 less all liabilities, obligations, taxes, debts, claims and causes of action of whatsoever nature, whether known or unknown, existing now, incurred between date of the agreement and closing date, or accrued to closing date.

"(c) The corporation will, on or before October 1, 1970, file for registration with the Securities Exchange Commission and within said time, the market value of the said stock of Food Host will not be less than $37.50

per share; that in the event the market value does not reach $37.50 within said time, Food Host will issue to Halbert, within 60 days after October 1, 1970, an additional debenture bond for the difference between the value of the stock issued (based upon the highest price that said stock reached before October 1, 1970) and the value of the stock computed at $37.50 per share. * * *

"5. This contract will be closed on or before October 1, 1968, at the office of Food Host."

In the performance of this agreement Food Host immediately took over the operation of the companies on October 1, 1968. Food Host stock was not issued to the plaintiff immediately because of the necessary period of time to compute, as an accounting matter, the liabilities of Halbert's companies so that the exact amount of stock called for by the contract could be transferred. However, from February until April of 1969, the evidence shows that the plaintiff repeatedly communicated with Food Host asking it to return his companies to him or issue him the stock, but no action was taken by Food Host.

The accounting finally revealed that the companies had net liabilities of approximately $22,462.50. Subtracting this from the contract price of $139,987.50 left a net figure of $117,525 which, divided by $37.50 per share guarantee, meant that Food Host was to deliver 3,134 shares of its stock to the plaintiff. On April 30, 1969, after the repeated demands of the plaintiff, Food Host issued a certificate representing the shares, but did not deliver it giving as the reason, "pending the closing of the contract."

While it held the stock, "pending the closing of the contract" Food Host split its stock two-and-one-half to one, reducing the contract price per share to $15 and increasing the number of shares deliverable to a total of 7,835 shares. Then, on June 11, 1969, Food Host filed a registration statement with the Securities Exchange Commission. On July 21, 1969, a certificate

representing the 4,701 additional shares was issued, but was again held by Food Host pending closing, as was the original issue of 3,134 shares. During this entire period of time, from February through July, the plaintiff continued to demand delivery of his stock, to no avail.

On September 4, 1969, the registration statement became effective. The plaintiff learned of this and telephoned Food Host (L. C. Price) and again demanded his stock. On September 13, plaintiff received the two previously issued certificates by certified mail. They were unregistered and one of the certificates bore the following barely legible stamped legend: "The shares represented by this certificate have *not* been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be pledged or hypothecated, and may not be sold or transferred in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel to the company that registration is not required under said Act."

On September 15, 1969, the plaintiff attempted to sell the shares through a broker, but was advised, in effect, that since the shares had not been registered they could not be sold "over the counter." It appears from the evidence that the only available market for the stock then was with private investors possessing a sufficiently sophisticated knowledge of the market to accept it without the protection provided by the Securities Exchange Act, in registering the stock. Again Halbert contacted Food Host (L. C. Price) and was told that the Food Host guarantee was still good. At that time the market price for Food Host registered stock was about $16 per share.

Subsequently, plaintiff made two unsuccessful attempts to sell the shares through private placement. Having failed to divest himself of the unregistered shares and being unable to secure the return of his companies

from Food Host, as we have pointed out above, the plaintiff commenced this action to secure registered and saleable shares. The action was commenced in January 1971.

The first question we are presented with is the right to resort to parol or extrinsic evidence in order to properly interpret this contract. Halbert claims that he was entitled to registered shares with a guaranteed price of $37.50 per share. We hold, as the trial court must have, that there is ambiguity in this contract. The uncertainty arises from the fact that no specific provision as to the type of shares to be issued to the plaintiff appears in the instrument, and yet Food Host promises to file for Securities Exchange Commission registration, an action in which the plaintiff would seem to have no interest if his shares were to be restricted and unregistered. Moreover, the contract was executed on September 30, 1968, and calls for a closing date on October 1, 1968. Despite the fact that it was impossible, under the terms of the contract for the issuance of the stock on October 1, 1968, since Food Host had to make its own post-acquisition accounting in order to determine the number of deliverable shares. Parol evidence is admissible to explain and clarify the contract under these circumstances. Barkalow Bros. Co. v. English, 159 Neb. 407, 67 N. W. 2d 336; Wilderman v. Watters, 149 Neb. 102, 30 N. W. 2d 301; Stillinger & Napier v. Central States Grain Co., Inc., 164 Neb. 458, 82 N. W. 2d 637. It also appears that Food Host drew the contract with the seller and the construction of the ambiguities will be weighted against the drafter. Podewitz v. Gering Nat. Bank, 171 Neb. 380, 106 N. W. 2d 497. We therefore hold that the trial court's finding that the contract contemplated the transference of registered stock was supported by the evidence and should be affirmed.

Food Host argues that by accepting and retaining the unregistered stock for a period of time, the plaintiff

waived any objections he might have to Food Host's performance. This argument is realistically refuted by the evidence that shows that Halbert continuously and consistently demanded his stock from sometime in February 1969, and the provisions of the contract which clearly contemplated that the stock, whether registered or not, was convertible into cash at the price of $15 per share under the guarantee given by Food Host. Food Host first raises this issue in this court and did not raise it in the district court. It is not available here. Hancock v. Parks, 172 Neb. 442, 110 N. W. 2d 69; Lucht v. American Propane Gas Co., 183 Neb. 583, 162 N. W. 2d 891.

The next objections of Food Host are procedural in nature. It objects to the decree below on the ground that it was an improper exercise of equity jurisdiction because the court, in effect, entered an award of money damages. It is therefore asserted that the plaintiff had an adequate remedy at law and that equity had no jurisdiction. No prejudicial error could have resulted to Food Host because the record shows that it waived a jury trial and thus subjected itself to a trial of facts by the court.

Was the remedy fashioned a proper one? It is elementary that equity, once it assumes jurisdiction, has the power to devise a remedy which will do complete justice and eliminate further litigation. Penn Mut. Life Ins. Co. v. Katz, 139 Neb. 501, 297 N. W. 899; Gatchell v. Henderson, 156 Neb. 1, 54 N. W. 2d 227.

The evidence shows that the market value of Food Host stock declined during the period of time the plaintiff was attempting to sell and to convert his unregistered shares into cash. It is clear that the mere issuance of registered shares after the long period of time in which there was delay in the delivery of the stock, would not give effect to the $15 per share guarantee which the contract specifically provides for. And yet Food Host still argues that in the event the court should make such a finding, effect must be given to

that portion of the contract which provides for the issuance of a Food Host debenture in the event the plaintiff realizes less than $15 per share on a sale of the stock. But the evidence shows that on September 15, 1969, the plaintiff attempted to sell the stock which had been held by Food Host "pending closing." It is clear all the way through the record in this case that the plaintiff did not care to speculate on the market price of Food Host shares and desired to convert the registered shares he was entitled to at the guaranteed price of $15 per share. Had his stock been registered at that time, September 15, as the evidence shows it should have been, plaintiff would have realized at least $15 per share, thus eliminating the need for the issuance of the debenture. The contract contemplates that the plaintiff had a right under his contract to sell his holdings for cash and avoid the issuance of the debenture. This he tried to do but was prevented from doing so by the defendant Food Host's failure to issue him the registered stock as was required by the contract. It is elementary that equity should restore the injured party, as nearly as possible, to the position required by the contract. The repurchase requirement of the contract was fashioned to achieve that end. To allow Food Host to postpone making good on its guarantee for 10 years, during which time the plaintiff would be an unwilling speculator in Food Host's solvency, would hardly do equity between the parties. There is no merit to this contention.

Food Host argues that the plaintiff did not make a sufficient effort to mitigate his damages. We agree with the trial court on this issue. The evidence shows that from the beginning Halbert did everything reasonable to market the shares of stock he was to receive and to convert them into cash. The only reason he was unable to do this was the failure of Food Host to deliver to him registered shares as was contemplated by the contract. There is no merit to this contention.

The last contention that Food Host makes is meritorious. The trial court allowed interest from the date of December 1, 1968. Food Host argues that this was an improper date and that prejudgment interest is not allowable. We hold that interest is allowable where the conduct of a party justifies its allowance, particularly where money or property belonging to another is wrongfully withheld to the enrichment of the debtor and to the detriment of the creditor. This is clearly what happened under all the facts and circumstances in this case. See, 47 C. J. S., Interest, § 13, p. 23; Workman v. Workman, 174 Neb. 471, 118 N. W. 2d 764.

In broad perspective Food Host retained the benefit of the restaurant operations, including the profits or possible profits and capital growth, during the very period of time when the plaintiff was vainly trying to sell his stock, which under the terms of the contract he was entitled to do and upon which there was a guarantee of $15 per share. It is clear that the plaintiff is entitled to interest from the delivery date of the stock, September 13, 1969. The facts show that Food Host was given a reasonable time following the effective date of the registration statement during which to issue plaintiff the registered shares which it did not do. We feel that at that point Food Host prevented the plaintiff from securing the benefit of his bargain while it retained his companies and operated them, and at that point interest began to accrue.

The judgment of the district court is affirmed as modified to include only an allowance of interest from the date of September 13, 1969. Costs taxed to appellant.

AFFIRMED AS MODIFIED.