WALTER V. JONES, DOING BUSINESS AS JONES CONSTRUCTION COMPANY, APPELLEE AND CROSS-APPELLANT, V. HOWARD ELLIOTT, HAROLD ELLIOTT, AND DELBERT URLING, DOING BUSINESS AS ELLIOTT BROTHERS AND URLING GRAIN COMPANY, A PARTNERSHIP, APPELLANTS AND CROSS-APPELLEES.

108 N. W. 2d 742

Filed April 21, 1961. No. 34853.

*Charles M. Bosley* and *Robert L. Jeffrey,* for appellants.

*George B. Hastings* and *Frederick E. Wanek,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action in equity brought in the district court for Hitchcock County by Walter V. Jones, doing business as Jones Construction Company, plaintiff, against Howard Elliott, Harold Elliott, and Delbert Urling, doing business as Elliott Brothers and Urling Grain Company, a copartnership, to foreclose a chattel mortgage and a mechanic's lien. The trial court found generally in favor of the plaintiff and against the defendants. The trial court further found that the plaintiff and defendants entered into a written agreement May 26, 1958, wherein the plaintiff agreed to remodel a Quonset building belonging to the defendants so that it could be used as a grain elevator, to erect two buildings for storage of grain, and to furnish the necessary equipment. The defendants agreed to pay $95,000 upon completion of the struc-

tures and buildings. The contract also provided that the defendants could elect a time-payment plan whereby the price would be $96,800, to be paid in certain installments in cash, of which $7,500 would be due upon completion of the buildings and structures, and the balance of $63,800 would be evidenced by four equal promissory notes each in the sum of $15,950, secured by a chattel mortgage on property belonging to the defendants. The trial court further found that after the execution of the agreement, the plaintiff commenced the reconstruction of the Quonset building and the construction of the storage building; that the defendants elected to take the time-payment plan; that on July 1, 1958, the defendants executed and delivered to the plaintiff the four promissory notes secured by a chattel mortgage; that said mortgage was a valid and enforceable lien upon the defendants' property described in the plaintiff's petition; and that the mechanic's lien filed by the plaintiff was not filed within the time provided for by law and was null and void.

The trial court further found that the defendants paid the plaintiff all cash installments provided for in the contract except the last installment of $7,500 which was due upon completion and acceptance of the building and structures; and that the plaintiff furnished extras in the sum of $948.12. The trial court further found that the plaintiff failed to comply with the plans and specifications of the contract in certain respects and, for failure to so do, allowed the defendants damages in the following amounts: Headhouse, $3,434.76; cement driveway, $995; aeration system, $311.45; rewiring for aeration system, $72.50; overhead auger, $320.05; and compression flanges, $377.21. The trial court further found that the defendants lost profits in the amount of $1,753.04. The trial court further found that said amounts should be allowed as a setoff from the $7,500 and $948.12 found to be due plaintiff; that by reason thereof, the plaintiff was entitled to the difference between

$8,448.12 and $7,264.01, or $1,184.11, with interest at 6 percent per annum from February 1, 1959, to date, in the sum of $89.78, or an aggregate of $1,273.89. The trial court further found that the notes signed by the defendants and delivered to the plaintiff were valid obligations of the defendants, and were past due; that the amount due the plaintiff on said notes was $72,049.68 with interest at 7 percent per annum from date until paid; and that the plaintiff was entitled to a decree of foreclosure of the chattel mortgage and sale of property described in the decree for payment of $72,049.68 with interest at 7 percent.

On May 5, 1960, the trial court rendered judgment in the amount of $72,049.68 with interest at 7 percent from date of rendition of judgment on the notes, as above stated, and also rendered judgment in the amount of $1,273.89 with interest at 6 percent from the date of the rendition of the judgment, as above stated. We conclude that when the trial court allowed interest at 6 percent on the $1,184.11 from February 1, 1959, to the date of rendition of the judgment, it was in error. The trial court apparently invoked section 45-104, R. R. S. 1943, which has no application in this case where there were damages allowed to be offset against a cash payment due upon the alleged completion of a building contract. The trial court should have rendered judgment in the amount of $1,184.11 with interest at 6 percent per annum from the date of the rendition of the judgment.

The defendants filed a motion for new trial which was overruled. From the overruling of the defendants' motion for new trial, the defendants appealed.

The defendants have set forth 24 assignments of error, most of which relate to the failure of the trial court in allowing sufficient damages to the defendants for breach of contract in certain respects by the plaintiff. The defendants also predicate error on the ground that the plaintiff failed to follow the plans and specifications of the contract relating to the footings and foundations

of the buildings, by virtue of which the defendants claim they sustained damages and for which the trial court allowed no damages; that the notes in question were not valid obligations, were usurious, and were void; and that the chattel mortgage given as security for the same was void, and consequently the plaintiff was not entitled to a foreclosure of the chattel mortgage. The defendants also claim that the trial court erred in finding that the defendants elected to pay the amount of the contract pursuant to the time-payment plan.

On December 16, 1959, when the trial commenced, the defendants were granted the right to amend their answer to the effect that the plaintiff failed to comply with the contract to properly construct the footings and foundations of the buildings.

The case is for trial de novo in this court.

The contract provides that the contractor should erect two Columbian rigid-frame grain-storage buildings, each 50 feet wide by 260 feet long with 14-foot high sidewalls, and roof ventilators placed on 20-foot centers. The contract provided for other construction and the furnishing of facilities, some of which are set forth in the trial court's findings and others that are not so set forth but have been considered as to whether or not they fail to comply with the plans and specifications, and what damages, if any, defendants would be entitled to recover.

The defendants were the owners of a leasehold interest in a tract of land owned by the Chicago, Burlington & Quincy Railroad Company, upon which two buildings were to be constructed for the storage of grain, and a Quonset building, which was standing on the premises, was to be remodeled so it could be used as a grain elevator.

Upon an examination of the record relating to the damages that the trial court has allowed for the items heretofore specified, the record sustains the amount of damages as awarded by the trial court to the defendants. The trial court denied the defendants damages on cer-

tain other items. We conclude that the trial court did not err in so doing because of the lack of proof on the part of the defendants respecting such damages. Also, the trial court did not err in refusing to allow the plaintiff certain amounts for extras claimed to have been furnished by the plaintiff, for the same reason.

We next consider how the footings and foundations were put in by the plaintiff. It might be said that they did not strictly comply with the contract, the plans, and the specifications relating thereto.

The contract provides as follows: "The Contractor shall furnish and pour concrete foundations, footings and floors and shall reinforce same in accordance with the specifications of the Columbian Steel Tank Company for the above buildings."

The specifications provide that the foundation shall be placed on firm, undisturbed soil; shall be designed for 3,000 pound soil bearing; must be adjusted to suit conditions; and shall be increased in depth to suit local soil and frost conditions.

The language of the contract and specifications dealing with the foundations and footings is vague as to the precise meaning with reference to the same. There is nothing in the specifications or the contract that definitely requires the foundations and footings to be built in depth to the frostline.

The evidence discloses that after the ground was leveled and packed, 2 x 6's were used for forms clear around the outer area of the building, and trenches 16 inches by 16 inches were dug, the inside edge having an 8-inch beveled edge extending from a point approximately 8 inches below the top of the foundation, making an overall surface of the foundation 24 inches in width and 16 inches in depth. At each 10-foot interval pillars were installed, approximately 24 inches square and 16 inches in depth. All foundations were reinforced with 1-inch steel bars hung approximately midway in depth from the top of the footing to the bottom, and extending

for the full length of all footings. The footings were also strengthened by steel bars approximately 10 feet long, set in transverse position at each pillar and extending into the floor which was superimposed on the footings. A 4-inch floor was poured as soon as the foundations were set, and was also reinforced with 10-gauge 6-inch mesh. It was one continuous operation. This is known as floating-type foundation or floating-slab foundation. Anchor bolts were set in the cement at the pillars to which the buildings were tied. The only reinforcing bar called for in the Columbian specifications is the 6-inch 10-gauge mesh in the floor, and the No. 5 reinforcing bars from the anchor bolts back into the floors.

The plaintiff testified that the soil upon which the buildings were built could hold approximately 5,000 pounds per square foot. The plaintiff also testified that his design of construction required more concrete than the Columbian specifications called for; that the flat storage, according to his design, gave far more tensile strength to the support of the building than did the Columbian design; and that he had been engaged in this type of business for 27 years.

The superintendent on the job testified that the footings and foundations for flat storage foundations such as in this case are usually of the depth of 16 inches; and that the so-called floating foundation is used by contractors in this type of building 60 or 70 percent of the time, the reason being if there should be a settlement in the fill, the floor and footings are tied together as a unit and this distributes the weight evenly upon the fill.

The chief engineer for the Columbian Steel Tank Company testified that he assumed that the ground upon which the buildings were to be constructed would have a 3,000 pounds per square foot soil bearing quality; that if the contractor inserted 1-inch steel bars for the purpose of reinforcement this would materially strengthen the foundation; that the floating-slab foundations are

used in climates similar to that of Nebraska; that from an examination of the buildings he observed no indication of any failures other than a few hairline cracks; that the footings and foundations were in good shape; and that there were no fractures. He saw no buckling of the frame members. He further testified that the test for the support of a foundation and footings of a building that rests on it is, if the building is loaded to capacity and stands up, it is a good indication that the building contains the strength to carry out the purpose for which it is built; and that where a building has been constructed for a year and a half and has been loaded with wheat, there is a reasonable probability that the building will stand and be used for the purpose for which it is built. On cross-examination this witness testified that he made a computation of the cement as to how much less cement there would be in the foundations under the buildings as constructed, compared with the amount of cement required by the Columbian plans, and found that there was very little difference in the amount.

An expert witness, an architect, testified for the defendants that he made 12 excavations around the foundations with a shovel, and determined that the depth of the slab varied from a minimum of 9 inches below the concrete floor to a depth of 14 inches below the floor; that his examination also disclosed a strong odor of decayed vegetation, indicating that the plaintiff had not scraped the surface of the site before making the fill; that he found rubbish consisting of broken tiles and broken cement in a part of the fill; and that one of the steel reinforcing rods protruded 4 inches below the bottom of the slab which could, by a process of rust expansion, destroy the stability of the cement. He discovered erosion of earth away from the slab on the south side of the south Columbian building. He testified that a floating slab is a nonstructural slab supported on grade or fill, not connected to any footing or foundation structure; that solid, undisturbed earth is

that which has not historically been uncovered previously, or, existing natural earth structure; that he presumed the soil upon which the building was erected would hold approximately 2,000 pounds per square foot and not 5,000 pounds as testified to by the plaintiff; that the Columbian plans require the soil to have a weight-bearing quality of 3,000 pounds, which is a conservative requirement, and that the buildings be erected on a firm, undisturbed soil; and that the plaintiff did not meet the requirements as provided by the contract. On cross-examination this witness testified that the buildings were solid at the moment; and that he was taking a calculated risk when he went under the pier to a depth of 2 feet and took out the supporting soil, however the building stood up. On redirect examination this witness testified that according to a comparison of the cement required to be used with reference to these footings and foundations, the plaintiff used only 41½ percent of the amount of cement called for by the plans and specifications in the contract. The ratio of 1,738 cubic feet supplied, compared to the required 4,185 cubic feet, gave this percentage. This difference in cement used and what the defendants claim should have been used constitutes part of the defendants' claim for damages sustained.

Another witness for the defendants made a computation of the cement and found that the plaintiff did not use the amount of cement that would be required for the footings and foundations to hold the buildings, and fixed the cost of the amount that he failed to use and which would be necessary to use at $6,585.82. This witness did not recommend any work being done on the buildings because it would be a waste of time and material. Also, he did not recommend underpinning the buildings. He was asked: "You have seen those foundations standing up solid and firm today as when that building was finished, have you not?" He answered: "I guess they are."

A witness engaged in the building of feed mills and grain elevators testified for the defendants that he inspected the buildings and the foundations, and made a computation with respect to the underpinning of the two buildings which he thought was necessary, taking into consideration the digging out of the ground under the present foundations, setting the forms, pouring and placing the cement back in, backfilling, and cleaning up. He testified that in this type of construction he would build a foundation just below the frostline, whereas the plaintiff's foundation was 12 to 14, and sometimes 16 inches in depth; and that the total figure for the underpinning and work incident thereto would amount to $9,355. On cross-examination this witness testified that he did not see a single defect in the footings or foundations of either of the two buildings which would justify the expenditure of any kind at that time; and that he never did a similar operation such as he proposed with reference to the footings and foundations of these buildings, and it would be purely experimental on his part.

A representative of the Butler Manufacturing Company, and a competitor of the plaintiff in the business of selling and erecting rigid-frame steel buildings, testified in substance that he found by inspection of the buildings that they were constructed in a manner particularly accepted by the industry; that the foundations were a duplication of the Butler Manufacturing Company design which had been designed through a matter of time as the safest design to maintain the kind of pressure the building would have to stand; and that he found nothing that was detrimental to the soundness of the buildings or the foundations, and concluded that it was a good workmanship job. He further testified that he did not use a transit, but sighted the buildings and they were straight. The foundations were straight, they followed a girt line. He found no cracks in the concrete foundations and no cracks in the floor which, in

his opinion, was exceptional. He testified that the design used in the construction of these buildings had been used by 95 percent of the industry and was generally accepted by the industry.

The record further does not disclose that the defendants, or any of them, made any complaint relative to the foundations and footings of these buildings from August 20, 1958, until December 1959. The record also shows that the defendants, or one of them, was on the premises at all times that construction was in progress and until the buildings were completed.

The first question to determine is whether or not the plaintiff substantially performed the contract.

While it is difficult to state what the term "substantial performance" or "substantial compliance" as applied to building and construction contracts means, it seems that there is substantial performance of such a contract where all of the essentials necessary to the full accomplishment of the purposes for which the thing contracted for has been constructed are performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract. See 9 Am. Jur., Building and Construction Contracts, § 42, p. 31.

Many cases in this jurisdiction have stated the rule with reference to substantial performance of a contract and the measure of damages relative thereto as follows: If a construction contract is substantially performed, the damage which the owner suffers because of defective workmanship or unsuitable materials used is measured by the reasonable cost of remedying the defects. See, Cartwright & Wilson Constr. Co. v. Smith, 155 Neb. 431, 52 N. W. 2d 274; Stillinger & Napier v. Central States Grain Co., Inc., 164 Neb. 458, 82 N. W. 2d 637.

The following rules relating to the measure of damages to be applied for breach of building contracts are also applicable in the instant case.

In Graham v. Anderson, 121 Neb. 733, 238 N. W. 362, it is said: "There is a generally accepted rule applicable to building contracts that, where defects in materials, construction or workmanship are remediable without materially injuring or reconstructing any substantial portion of the building, the damage which the owner is entitled to recover is the expense of making the work conform to contractual requirements. See 23 A. L. R. 1436; 65 A. L. R. 1298. This rule has been recognized in Library Board v. Ohlsen, 110 Neb. 146.
\* \* \*

"There is, however, another generally accepted rule to the effect that, where a contractor's violations of a building contract result in defects which cannot be remedied without reconstruction of, or material injury to, a substantial portion of the building, the measure of the owner's damages is the difference between its value when constructed and what its value would have been if built according to contract. Cases so holding are collected in 23 A. L. R. 1438. This is in harmony with the view expressed in Lincoln Stone & Supply Co. v. Ludwig, 94 Neb. 722. There is no conflict between the two lines of decisions. Each rule is enforceable under any state of facts to which it applies." With reference to the latter rule see, also, Walsh v. Cornwell, 272 Mass. 555, 172 N. E. 855; Taulbee v. Moore, 106 Ky. 749, 51 S. W. 564; Pelatowski v. Black, 213 Mass. 428, 100 N. E. 831; Gutov v. Clark, 190 Mich. 381, 157 N. W. 49; Otis Elevator Co. v. Flanders Realty Co., 244 Pa. 186, 90 A. 624; Karlinski v. P. R. & H. Lumber & Constr. Co., 68 N. D. 522, 281 N. W. 898.

In the instant case, relating to the alleged damage to the footings and foundations, the rule that should be adopted as the measure of damages would be the difference between the value of the buildings when constructed and what their value would have been if built according to the contract and the plans and specifications relating thereto. The plaintiff gave as his opinion as

to the difference in value between the buildings as constructed by him and the buildings if constructed according to the plans and specifications of the Columbian Steel Tank Company, that the buildings as now constructed had a greater value than had they been constructed according to the plans and specifications of the Columbian Steel Tank Company.

It appears from the evidence that any underpinning of the present foundations could cause disastrous results. The defendants have had the use of these buildings since August 20, 1958. Each of the buildings had a capacity for the storage of grain of 167,000 bushels. It is apparent from the evidence that the buildings are fulfilling the functions for which they were built. The defendants in their brief state: "It seems clear that the parties have achieved their object insofar as the grain storage buildings were built (although belatedly) and useable." We conclude, as did the trial court, that the plaintiff substantially performed the contract.

The trial court awarded the defendants $1,753.04 damages for loss of profits due to the failure of the plaintiff to have the south Columbian building ready for the storage of wheat by July 1, 1958.

Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. See Restatement, Contracts, § 331, p. 515, § 333, p. 525.

The evidence supports the trial court's award of damages for loss of profits suffered by the defendants.

The trial court, at the request of the parties, inspected the premises, the footings, and the foundations of the buildings. "The trial court is required to consider any competent and relevant facts revealed by a view of premises as evidence in the case, and a duty is imposed on this court on review of findings made by the trial court to give consideration to the fact that the

trial court did view the premises; provided, that the record contains competent evidence to support the findings." Columbian Steel Tank Co. v. Vosika, 145 Neb. 541, 17 N. W. 2d 488. See, also, Jack v. Teegarden, 151 Neb. 309, 37 N. W. 2d 387.

The contract provided for a cash price which the plaintiff could accept in payment on the completion of the work. The defendants were granted an option, also, to make payment on a time-plan basis. The cash price was $95,000. The time-payment plan price was $96,800. The evidence shows that the defendants read the contract, were acquainted with its terms, understood it, and signed it. The defendants, however, contend that they at no time accepted the time-payment plan; and that the notes were signed solely for the convenience of the plaintiff because he wanted it that way as it would be beneficial to his business. The fact remains, the defendants did execute the notes and the chattel mortgage as security therefor, in conformity with the contract providing for the time-payment plan. The defendant Howard Elliott never notified the plaintiff they were going to pay him according to the time-payment plan. The defendant Urling testified with reference to the $25,500 payments made, that when the first payment was due they were unable to find a checkbook, consequently they paid this amount by an $18,000 check, and subsequently by a $7,500 check.

The case of Robb v. Central Credit Corp., 169 Neb. 505, 100 N. W. 2d 57, related to an automobile dealer, and the same rule as therein set forth would apply in the instant case. The court said that an automobile dealer may in good faith sell a car on time for a price in excess of the cash price without tainting the transaction with usury, though the difference in prices may exceed lawful interest for a loan. However, in order to have the foregoing principle apply it must appear that the buyer actually was informed of and had the opportunity to choose between a time sale price and a cash

sale price. See, also, State ex rel. Beck v. Associates Discount Corp., 168 Neb. 298, 96 N. W. 2d 55; Nelson v. General Credit Corp., 166 Neb. 770, 90 N. W. 2d 799.

We conclude that the evidence shows the defendants accepted the time-payment plan, were acquainted with and knew of all the details with reference to accepting such plan, and elected to do so. We find the defendants' contention to the effect that the notes and chattel mortgage securing the same were null and void is without merit.

The plaintiff cross-appealed, contending that the trial court erred in assessing the damages for the defendants in the amounts allowed. We find no merit to the plaintiff's cross-appeal and it is hereby dismissed.

Other matters are raised which we deem unnecessary to discuss.

We conclude that the judgment of the trial court should be modified in the manner heretofore stated and in all other respects its judgment should be affirmed, each party to pay his own costs in the district court and in this court.

AFFIRMED AS MODIFIED.

SIMMONS, C. J., participating on briefs.