**NATHAN CONSTRUCTION COMPANY,**
a Corporation, Appellant,

v.

**FENESTRA, INCORPORATED**, a Corporation, Appellee.

**Julius NOVAK, Appellant,**
v.

**FENESTRA, INCORPORATED, a Corporation, Appellee.**

Nos. 19216, 19217.

United States Court of Appeals
Eighth Circuit.

April 10, 1969.

Steven J. Riekes, of Beber, Richards & Polack, Omaha, Neb., for appellants.

Robert L. Berry, of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for appellee; Lyman L. Larsen, Omaha, Neb., with him on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

BLACKMUN, Circuit Judge.

Fenestra, Incorporated, instituted this diversity suit against Nathan Construction Company to recover a balance of $49,817.84 claimed to be due from Nathan under a 1962 construction subcontract for windows and a curtain wall for an Omaha building. Fenestra alleged full performance on its part.

Nathan's answer asserted that the curtain wall which Fenestra supplied was of inferior design and workmanship and did not comply with the controlling specifications in that it permitted excessive air, water and dust infiltration, it did not move freely with changing temperature and created excessive stresses and distortions, and it was improperly sealed and subject to abnormal deterioration. Nathan counterclaimed for $395,000 in damages based upon its alleged inability to fulfill its obligations to Julius Novak, the building's owner, or, in the alternative, for indemnification against any liability on its part to Novak. Novak was permitted to intervene, under Civil Rule 24(b), as having a claim with questions of law and fact in common with Nathan. Jurisdiction is established.

The case went to trial before Chief Judge Robinson without a jury. He found that Fenestra had demonstrated substantial performance of its obligations under the subcontract; that, with substantial performance thus shown, Nathan and Novak had the burden of proving any damages which they had incurred; and that they had not sustained this burden and were not entitled to any setoff. Accordingly, judgment was entered in favor of Fenestra for the $49,817.84 balance and dismissing Nathan's counterclaim and Novak's claim with prejudice. Nathan and Novak appeal.

The building in question was an existing one at 3002 Farnam Street in Omaha. Novak contemplated a complete remodeling of this structure into a luxury type apartment and office building to be known as the Twin Towers Apartments. Nathan was the primary contractor for the work. Its agreement with owner Novak contained the usual provisions for compliance with specifications and, in particular, called for the installation of a curtain wall. In due course, and preliminarily, the structure's brick facing was removed and the building reduced to its structural shell.

By the subcontract between Nathan and Fenestra the latter agreed to furnish and install windows and the curtain wall. The stated consideration was $105,000. The subcontract contained provisions, pertinent here and set forth in the footnote,* relating to workmanship, infiltration, and thermal expansion.

---

* 5. WORKMANSHIP:
  (A) Only first quality workmanship executed by skilled mechanics shall be acceptable. It shall be the responsibility of this subcontractor to produce curtain walls and windows of first class quality which will not leak or allow any weather infiltration, will permit free movement without generation of such infiltration, nor of noises or visible distortion of any kind; and which will meet all other requirements of this specification * * *.

7. CONSTRUCTION:
  (A) * * * Intersecting meeting rails and muntins shall be tenon jointed to the frame, securely riveted and welded, and sealed with liquid polymer based sealants to form absolute watertight joints.

14. INFILTRATION:
  (A) All components shall be fabricated and gasketed for erection so as to prevent infiltration of weather. Air infiltration of ventilators shall not exceed ⅓ C.F.M. per foot of crack when closed. Fabrica-

Nathan and Novak urge that Fenestra failed to prove performance or even substantial performance according to the specifications; that even if substantial performance was shown, Fenestra did not prove the cost of remedying the difference between substantial performance and complete performance; and that the burden of proof of that cost was upon Fenestra.

Plaintiff Fenestra's opposing argument is that if it has fully performed its contract, it is entitled to the contract price; that if it has only substantially performed, it is entitled to the contract price reduced by any damage sustained by Nathan and Novak; that the district court's findings that Fenestra had shown substantial compliance are amply supported by the evidence; that the burden of proving damage is on Nathan and Novak; and that they have failed to sustain that burden.

The record is fairly substantial and it would serve no good purpose to review all the evidence in detail. The parties have set it forth in their briefs and are thoroughly familiar with it. It suffices for us to note and emphasize the following:

1. The curtain wall was not anything new in Omaha. Curtain walls had been used in other renovation work in the area. As Judge Robinson noted in his unreported memorandum, "Photographic exhibits show an attractive siding material without patent deficiencies." The exterior design was by Novak's architect and was determined before Fenestra acquired its status as subcontractor. Fenestra prepared shop drawings. Certain adjustments in these were made in accord with conditions encountered on the site. Fenestra's superintendent on the job worked with the contractor's superintendent there.

2. Fenestra's work was open and obvious. It was never told to stop its work. Representatives of the contractor and Novak himself inspected the project frequently.

3. Fenestra regarded its work as complete by June 1963. Its personnel inspected the curtain wall and detected no infiltration of air or weather.

4. Nathan, however, refused to pay the balance due on the subcontract amount. Initial meetings were held between representatives of Fenestra and Nathan and Novak to ascertain the basis of complaints which were being made and what might be done to remedy those complaints.

5. Another meeting was held in Omaha in January 1964. It was attended by Mr. Novak and representatives of Nathan and Fenestra. The building was inspected. No evidence of leakage was found.

tion shall in all instances provide for venting and weeping of vapors, moisture, etc. to the outside atmosphere. Condensed interstitial moisture shall be channeled through troughs in upper webs of tubular horizontal members. The moisture shall pass through the jamb vents into the vertical mullion void, downward into the sill gutter. No outlet vents or weep holes shall be directly exposed to the exterior atmosphere.

15. THERMAL EXPANSION:

(A) Fabrication of all components shall permit unrestricted movement between components to prevent any stress resulting, or distortion. All members shall remain in alignment horizontally and vertically throughout all temperature changes and shall remain watertight at all times. Where fit must be tight to prevent weather infiltration, suitable gaskets shall be provided to prevent noise resulting from metal-to-metal movement and to exclude weather.

17. ERECTION:

* * * * *

(B) * * * Ventilators shall be serviced after erection and before glazing so that air infiltration requirements will be met. * * *

18. GUARANTEE:

(A) The contractor shall obtain from the manufacturer and file with the owner the following guarante.

The entire fenestration system, including aluminum sash, mullions, frames, metal sills, metal copings, finished closure plates, gutters, and all related parts of caulking and jointing shall be guaranteed as watertight installation for a period of two (2) years after date of final acceptance.

6. Another meeting took place in April. Fenestra had a weather-stripping man present to install an aluminum sample on vents. Novak watched the installation and spoke favorably of it.

7. Fenestra ordered enough material to weather strip the vents. It was instructed to install it in vacant units first. These then constituted about 25 per cent of the building. When the weather-stripping work was completed in the unoccupied apartments and in one which was occupied, a Nathan representative ordered Fenestra to stop the work and remove its crews from the building. Novak stated that a reason for this was that there was a continuous hum from the stripping. There is some dispute as to whether the stripping so installed was ever removed. Shortly after the work was stopped and during a heavy wind and rain storm Fenestra representatives inspected the building and vents. Again they found no water or air infiltration.

8. Still other meetings took place in July, August, and September 1964. These produced nothing by way of specific demonstration to Fenestra that the complaints of water and air infiltration were supported.

9. At a May 1966 meeting a complaint was made that caulking had failed. Fenestra people were unable to find evidence of caulking failure. They did note that some neophrene was loose. They also found some cracking in surface paint which they attributed to the caulking's elastic ability to "move" with the grid system. Paint does not have this characteristic. There was also a complaint that snow had come in around one vent in an unoccupied apartment. Inspection disclosed that the vent was open. It was not known how it came to be open.

10. A final meeting took place in November 1966, almost 3½ years after Fenestra's work was completed. One sagging neophrene member and a few loose ones on the outside of the building were observed. A complaint was made that light was coming through the curtain wall. Fenestra representatives claimed the light came up into the ceiling plenum from the room below through space between the ceiling and the curtain wall. A card was inserted and pulled through the opening. Fenestra had not installed the ceiling.

11. The curtain wall is so constructed that it is free to move by expansion and contraction as temperature varies. The wall's components are affixed by tape and caulking and, on the exterior, by a neophrene glazing bead. All these permit movement. Each grid unit is independently attached to the building by welding. There was testimony that there was no evidence of stress on the welds and that the grid system is self-draining by the channeling of water into the vertical members and down to the bottom of the wall.

12. The owner's architect acknowledged that the specifications recognized some permissible infiltration in the ventilators and that infiltration depends on wind velocity and pressure.

13. Some apartments in the building were first rented in July 1963. The rest were ready about November of that year. Since then every unit in the building has been rented at some time. The vacancy rate for the 119 units has been as low as 6 or 7 per cent. Rentals run from $135 to $425 per month. Persons of all ages have lived there. Novak himself described the building at one time as "plumb full".

Nebraska law applies.

Obviously, the burden of proving compliance with its obligations under the contract is upon plaintiff Fenestra as the party which seeks recovery of what it claims to be due. Witt v. Old Line Bankers' Life Ins. Co., 92 Neb. 763, 139 N.W. 639, 640 (1913); 17A C.J.S. Contracts § 590b.(1) (1963); 13 Am.Jur.2d Building and Construction Contracts § 121 (1964).

In evaluating the satisfaction of this burden and the application of the clearly erroneous standards under Civil Rule 52(a), we necessarily view the record's factual material in the light most favorable to Fenestra as the prevailing

party below. Barber-Greene Co. v. Bruning Co., 357 F.2d 31, 36 (8 Cir. 1966); St. Louis Testing Laboratories, Inc. v. Mississippi Valley Structural Steel Co., 375 F.2d 565, 566 (8 Cir. 1967).

A. *The intent of the parties.* The defendant and the intervenor argue that weather protection was important for this reconstruction job and was deemed necessary and highly desired by them. There is little question as to this. The subcontract's provisions quoted in the footnote reveal its significance. Correspondence and conversations between the parties bear this out.

However, we do not read the subcontract as one which required that the building be *absolutely* water-and-weathertight, with nothing due Fenestra if that high standard were not fully met. Indeed, despite prior references in the agreement to nonallowance of "any weather infiltration" and to gasketing "to prevent infiltration of weather", the quoted paragraph 14 recognizes the possibility and permissibility of some infiltration: "Air infiltration of ventilators shall not exceed ⅓ C.F.M. per foot of crack when closed." What is imposed is a limitation, not an absolute guarantee of no infiltration.

Our issue, then, as the defense points out in its brief, is whether the plaintiff constructed the type of weathertight curtain wall called for by the specifications.

B. *Fenestra's posture.* Plaintiff Fenestra at all times has taken the position not that it rendered only substantial performance of its subcontract with Nathan but that it fully performed its obligations under that agreement and that it therefore is entitled to recover the balance of the stated contract price. The complaint alleges, "That plaintiff has fully and properly performed its said Subcontract with defendant and is entitled to be paid in full therefor." Judge Robinson observed this and said, in his memorandum, "Plaintiff's position in its complaint and throughout the trial was that it had completely performed its obligations under its subcontract with Nathan Construc-

tion." Thus it was the trial court which advanced the concept of substantial performance into the decision of the case and made findings with respect thereto.

C. *Substantial performance.* It has been said that American courts are united in holding that a substantial performance of a building or construction contract will support a recovery either on the contract or, in some jurisdictions, on a quantum meruit basis. Three reasons for this have been advanced: (1) that work on a building is such that, even if the owner rejects it, he receives the benefit of it and it is equitable to require him to pay for what he gets; (2) literal compliance with every detail of specifications is impossible; and (3) the parties are presumed impliedly to have agreed to do what is reasonable under all the circumstances with respect to performance. 13 Am.Jur.2d Building and Construction Contracts § 41 (1964). See 5 Williston on Contracts § 805 (3d ed. 1961).

Substantial performance, of course, is not easily defined. Fortunately for us, in this diversity case, the Nebraska Supreme Court has announced its definition of the concept and has recognized substantial performance in litigation on building and construction contracts.

"While it is difficult to state what the term 'substantial performance' or 'substantial compliance' as applied to building and construction contracts means, it seems that there is substantial performance of such a contract where all of the essentials necessary to the full accomplishment of the purposes for which the thing contracted for has been constructed are performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract." Jones v. Elliott, 172 Neb. 96, 108 N.W.2d 742, 748 (1961). This follows the definition suggested in 13 Am.Jur.2d Building and Construction Contracts § 43, at 46 (1964).

■ Judge Robinson, utilizing this definition, flatly found, "Clearly, Fenestra has shown substantial compliance with its obligations under the subcon-

tract; the owner has received substantially what he bargained for." We are in full accord with this holding and find it most adequately supported in the record by the following:

1. The building's curtain wall was timely erected and presented an attractive appearance.

2. The wall serves the function for which it was intended and installed. Jones v. Elliott, supra, 108 N.W.2d at 749.

3. The system has not failed as to durability; as to thermal expansion and contraction without distortion; a.1d as to the channeling of moisture to the ground.

4. Simple smoke tests and other inspections made in response to complaints revealed little or no infiltration.

5. Fenestra was willing to go beyond the contract and to install weather stripping in an attempt to silence the complaints.

6. The neophrene gaskets were properly installed despite the fact that one or a few were later found to be loose.

7. The complaints by Nathan and Novak center in alleged weather infiltration. Yet some of this proved to be directed to a vent's being open for an unknown reason, and yet capable of being closed, and to a claimed aperture which proved not to be an aperture at all.

8. The alleged defects have not affected occupancy. Occupancy of the building has been high and by people of all ages and at rates where comfort and appropriate weather protection would be expected and demanded. Tenant complaints have not been directed to the deficiencies asserted by Nathan and Novak. Obviously, the subject of Nathan's and Novak's complaints did not render the building uninhabitable.

9. We observe nothing indicative of bad faith on the part of Fenestra. No challenge to its good faith appears to be made. Fenestra's work was performed openly. It worked with representatives of Nathan and with Mr. Novak himself. Nathan and Novak had their experts on the scene. See Jones v. Elliott, supra,

108 N.W.2d at 748. Fenestra sent supervisory personnel frequently to inspect. And during construction Fenestra was never ordered off the job or asked to stop its work.

10. The frequency of the meetings between the parties after the work had been completed and at various seasons of the year demonstrates a desire and a willingness on Fenestra's part to ascertain the basis of the complaints and to remedy them.

11. Such items as a loose gasket or two which became evident months after completion of the work strike us as matters of ordinary maintenance. Buildings, when used or even when not used, do depreciate and require repairs. Fenestra made no agreement that it would supply a nondepreciable, everlasting and repair-free curtain wall.

From the entire record we gain the impression that Fenestra in good faith leaned over backwards in a sincere attempt to ascertain the grounds of the Nathan and Novak complaints; that, in its many meetings and inspections, in its willingness to weatherstrip, in its reinforcement of already installed brackets, and in other ways, Fenestra did all which could reasonably be expected of it to give consideration to the complaints and to remedy any which were justified; that its efforts thus to satisfy were not a concession of inadequacy of performance; that, actually, the record is supportive of a finding of complete, rather than only substantial, performance; and that there was substantial compliance under any analysis of the facts. Were we the trier of fact, we would be inclined to conclude that Nathan and Novak received all they bargained for and that Fenestra had demonstrated complete performance. Of course, it is always possible that the work could have been better performed. This is so with respect to almost any kind of work including, we might note, judicial opinions.

We therefore reject the argument of the defendant and intervenor that substantial performance of the subcontract was not shown.

D. *Damages*. This takes us to the issues of damages and of the burden of proof as to damages. There is authority, advanced by the defendant and intervenor, to the effect that under certain circumstances the less-than-full performer has the burden of proving the cost of remedying the deficiences and that, if he fails in this burden, his lawsuit founders for lack of proof.

"It has been decided that he who relies upon substantial as contrasted with complete performance must prove the expense of supplying the omissions, or he fails in his proof, for he cannot recover for full performance when a part of the contract is still unperformed. As he does not show full performance, it is not requiring too much of him to show what it will cost to remedy the defects in order to permit him to recover the contract price less the sum allowed for a defective performance. Under some circumstances, however, the burden of showing the amount necessary to remedy the defects may rest upon the owner" [footnotes omitted]. 13 Am.Jur.2d Building and Construction Contracts § 121 at 112 (1964).

Spence v. Ham, 163 N.Y. 220, 57 N.E. 412, 413, 51 L.R.A. 238 (1900); Atkinson v. Jackson Bros., 270 S.W. 848, 851, 38 A.L.R. 1377 (Tex.Comm.App.1925); Roberts v. Sinnott, 55 Mont. 369, 177 P. 252, 253 (1918); Watson Lumber Co. v. Guennewig, 79 Ill.App.2d 377, 226 N.E.2d 270, 280 (1967). There are cases along this line which are suits by a subcontractor against the general contractor. Pacific Coast Eng'r Co. v.Trinity Constr. Co., 410 S.W.2d 797, 800 (Tex.Civ.App. 1967); Williams v. National Sur. Corp., 257 F.2d 771, 774 (5 Cir. 1958). In some of these cases, as suggested by the quoted text, the contractor relied only on substantial performance and equitable principles and conceded less than full performance on his part. This contrasts with Fenestra's position here where consistently it has alleged complete performance. It states that it is then illogical to impose upon it the burden of proving the cost of remedial work which it claims has already been performed.

We need not decide what burden of proof significance, if any, Fenestra's insistence on full performance may possess, and we need not concern ourselves with what the law may be outside Nebraska. We so conclude because we feel that the Nebraska Supreme Court has announced principles, controlling here, as to the measure of damages in a substantial performance building contract situation and as to the burden of proof.

As to the measure of damages, the court has stated: If the damage is due to defective workmanship or unsuitable materials and the matter is remediable without materially injuring or reconstructing the building, the measure is the reasonable cost of remedying the defects. Jones v. Elliott, supra, 108 N.W.2d at 748; Stillinger & Napier v. Central States Grain Co., 164 Neb. 458, 82 N.W. 2d 637, 648 (1957); Cartwright & Wilson Constr. Co. v. Smith, 155 Neb. 431, 52 N.W.2d 274, 281–282 (1952); Graham v. Anderson, 121 Neb. 733, 238 N.W. 362, 363–364 (1931). See 76 A.L.R.2d 805, 815–20 (1961). If, however, the defects cannot be remedied without reconstruction of or material injury to a substantial portion of the building, the measure is the difference between the building's value when constructed and what its value would have been had it been built according to the contract. Jones v. Elliott, supra, 108 N.W.2d at 748. Further, "There is no conflict between the two lines of decisions." Graham v. Anderson, supra, 238 N.W. at 364.

■ Obviously, the first of these two rules applies here. There is no suggestion that remedying the complaints made by Nathan and Novak would require reconstruction or material injury to a substantial portion of the building. The measure of damage, therefore, is the reasonable cost of the remedial work.

■ So far as the burden of proof as to such costs is concerned, we agree with Judge Robinson and read the Nebraska cases as definitely imposing that burden

on the party who claims he was injured by the defects. In Rickertsen v. Carskadon, 172 Neb. 46, 108 N.W.2d 392, 396 (1961) the court said:

"If there is a substantial performance, the action may be maintained but without prejudice to any showing of damages *on the part of defendant* for the failure to receive full and complete performance.

\* \* \* \* \* \*

"On the question of damages, if the plaintiff has fully performed his contract he is entitled to the contract price. If the plaintiff has substantially performed his contract he is entitled to the contract price, less any damage *proved by the defendant* to be occasioned by less than complete performance" (emphasis supplied).

In Jones v. Elliott, supra, 108 N.W.2d at 745, the court similarly said:

"The trial court denied the defendants damages on certain other items. We conclude that the trial court did not err in so doing because of the lack of proof on the part of the defendants respecting such damages."

See also Cartwright & Wilson Constr. Co. v. Smith, supra, 52 N.W.2d at 283; McGowan v. Gate City Malt Co., 89 Neb. 10, 130 N.W. 965, 966 (1911). Nathan and Novak would dispute the authority of these cases; they argue that the Nebraska court has made no ruling on the burden of proof issue. As indicated, we read the Nebraska cases contrarily. Nathan and Novak would further rely on the material quoted above from 13 Am. Jur.2d. However, the first and the last sentences of the quotation persuade us that on the facts here the general law is something other than that argued by the defendant and intervenor.

Affirmed.